## CITY OF NEW ORLEANS *v.* PAINE.

*(Circuit Court of Appeals, Fifth Circuit. June 20, 1892.)*

No. 32.

PUBLIC LANDS—SURVEYS—AUTHORITY OF LAND OFFICE.

A surveyor, acting under special instructions based upon an opinion of the secretary of the interior, surveyed an old Spanish grant, and reported the same to the surveyor general. Protests were filed against the survey; but the surveyor general approved the same, and forwarded it, together with the protests and evidence, to the commissioner of the general land office. The latter accepted the survey in part, but reserved the remainder for further consideration, meantime directing the surveyor general to withhold the filing of the triplicate plats from the local land office. The matter was then referred to the secretary of the interior, who held that the survey did not comply with the decision of his predecessor, and directed a new survey. *Held,* that the action of the surveyor general and the commissioner did not exhaust the authority of the land department, but that the matter was still lawfully pending therein, and the courts, therefore, had no authority to enjoin the obliteration of the old survey or the making of the new one. 49 Fed. Rep. 12, affirmed.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

In Equity. Bill by the city of New Orleans against Ruffin B. Paine, a deputy surveyor, to enjoin the obliteration of an old survey and the making of a new one directed by the secretary of the interior. An injunction was denied and a temporary restraining order dissolved. 49 Fed. Rep. 12. Complainant appeals. Affirmed.

*J. L. Bradford,* for appellant.

*Wm. Grant,* for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

McCORMICK, Circuit Judge. The appellant is the owner of certain lands on the left bank of the Mississippi river, about 50 miles above New Orleans, embraced in a grant made by the French authorities on the 3d of April, 1769, to one Dupard. The land was described in the grant as having "30 arpens of front to the river, upon the whole depth which shall be found unto Lake Maurepas." The front of the grant was increased to 40 arpens, which is accounted for by the action of the river increasing the arc of the bend. The authorities of the land department have uniformly recognized the grant as a completed grant of former governments; and no substantial difficulty has been encountered in fixing its front on the river, and the direction of its side lines, following the rule that has obtained in the survey of riparian grants in Louisiana, that side lines shall be extended at right angles to the general course of the bank at the points from which they depart. The front of this grant being on the convex side of a bend of the river, the side lines rapidly diverge; the course of the upper or western line being N., 27° 48′ W., and the course of the lower or eastern line being N., 17° 10′ E. But much contention and difficulty, and diversity of views by various officials of the land depart-

ment, and the successive owners of this grant, and parties having rights in the adjacent lands, have been experienced in fixing the depth of this grant and correctly establishing its rear line.

Lake Maurepas is situated towards the rear of this grant, but is not now immediately in its rear, as no extension of its side lines would touch or include any part of that lake. It seems to be certain that the western shore of the lake has receded, and the southern boundary extended, since the date of this grant. The Amite river, whose waters connect with the lake, is to the rear of this grant, and the owner of the grant has claimed that the side lines should be extended to that river; and this claim appears to have met at one time the approval of the surveyor general for Louisiana, but encountered the opposition of the state of Louisiana, which was interested in the question by reason of the grant to her by act of congress of the adjacent swamp lands. Such has been the controversy as to the rear line of this grant that it is not seriously contended that its correct location was ever fixed until after a decision made by the secretary of the interior on the 6th of January, 1888, in which decision the secretary, addressing the acting commissioner of the land office, announced his ruling as follows:

"In this case a line drawn through the center of the grant, from the front to the rear, terminating at the point of intersection of a line drawn at right angles thereto, so as to touch the lowest point of the southern shore of the lake, would seem to determine accurately a depth as far back as Lake Maurepas. It seems to me that this is the only rule by which the depth of this grant can be ascertained in accordance with the terms of the grant. I am therefore of the opinion that the depth of this grant only extends as far back as the southern shore of Lake Maurepas, and that the side lines of the grant should not be extended further than that depth. * * * Your decision is reversed, and you will direct that the survey of these public lands (adjacent) be closed upon this grant in accordance with the rule above stated."

Thereupon the commissioner of the land office directed the surveyor general to have the survey made in accordance with said decision. The surveyor general, in executing that direction, made a contract with the appellee, covering the work of making the survey, and instructed said deputy, November 11, 1889, that—

"The back line of the claims of McDonogh and Fontenot, being the back line of the grant to Dupard, as restricted in depth by the aforesaid decision, you will survey and locate in the following manner:

"You will carefully examine the southern shore line of Lake Maurepas, and if entirely satisfied, from reliable evidence, such as is contemplated under the head of 'Private Land Claim Surveys,' p. 111 of the printed manual, or from any other reliable proof, and your own examinations, that there has been a change in said shore line since the grant was made, viz., 1769, you will proceed, under such proof and upon your own responsibility, as a sworn officer, to ascertain the position of such shore line in 1769, as near as may be.

"And if it cannot be thus ascertained, to your satisfaction, where it was, so far back as 1769, you will ascertain where it was at any time since then, if this can be done safely and satisfactorily.

"If you find no reasons to think the shore has changed, or if the evidence resulting from your examinations and from the other evidence you may obtain is not satisfactory on this point, or will not enable you to fix it in any

other position than it now occupies, you will conclude that its position now marks its position in 1769, when the grant was made.

"Having thus satisfied yourself as to the true southern shore line of the lake at the date of the grant, you will run a blank compass line, without marking or measuring the same, from the most southern point of such shore line, so ascertained, in a west course, to the lower side line of the Fontenot claim, heretofore directed to be extended from the south line of T. 10 S., R. 6 E.: you will at such point of intersection establish the lower back corner of the grant and of the Fontenot claim.

"From that point you will prolong the line west, marking and measuring the same, to the upper side line of McDonogh, as surveyed by John Kap, establishing a corner at the intersection of the lower side line of that claim, and taking connections with all township and section lines, and establishing corners at such intersections."

On the 24th February, 1890, the foregoing instructions were thus modified:

"The secretary having held, as I am now advised by the commissioner, that such back line should not run west from the southern extremity of Lake Maurepas, but should run therefrom on such a course as will be perpendicular to the axis of the Dupard grant, your former instructions are modified as follows:

"Having satisfied yourself of the true position of the lake, as directed in your former instructions, you will run the back line therefrom on a compass direction which will be at right angles to a line which would run through the center of the French grant. But this center line or axis of the grant need not itself be run on the ground. Its course will be a mean between the courses of the upper and lower side lines of the grant, as heretofore established, and to be established by you, as heretofore directed.

"In running such back line, you will mark it, establish corners on it, and take connections of other lines it may intersect, as heretofore instructed, in every respect as though no other change had been made in your former instructions, except as to the course of the same."

The appellee, as deputy surveyor, having made the survey under these instructions, reported the same to the surveyor general's office, showing that he had thoroughly examined the lake and its shores, and had taken the affidavits on the subject, of all the old and reliable settlers he could readily find, which affidavits he made a part of his returns; that he could form no definite conclusion from his examination and the estimates of the settlers as to where the shore line of the lake was at the date of the grant; that the only thing which seems certain is that it was then a long way from where it now is. And he further says:

"In fixing upon the distance of 104.87 chains, I have tried to adopt a location which would probably give the claims all the depth they are entitled to, without extending them so far as some of the evidence would require."

Against the adoption of this survey, Hon. John McEnery, as agent for the state of Louisiana, and W. H. Rogers, attorney general of Louisiana, and Messrs. J. L. Bradford and C. W. Holcomb, attorneys for the cities of New Orleans and Baltimore, and others, protested. The report of the survey, with diagrams, plats, transcript of the field notes, the affidavits made part of the returns, and the protests above mentioned,

were all transmitted to the commissioner of the land office for his action thereon, and on the 23d of January, 1891, the commissioner, in a letter to the surveyor general, after reviewing the record, says:

"In view of the foregoing, and of the condition expressed in the contract allowing partial payments as the survey progresses, I hereby accept the survey as far as herein considered; and as the several points of objection to the acceptance of some of the lines established in this survey, as set forth in the protests above mentioned, will necessarily demand a further consideration by this office, you are directed to withhold the filing of the triplicate plats from the local land office until you are further advised in regard thereto."

The matter was submitted to the secretary of the interior for his decision; and on the 14th of May, 1891, the then acting secretary gave his decision, addressing the commissioner of the land office:

"SIR: I am in receipt of your letter of March 20, 1891, calling attention to the decision of the department of January 6, 1888, in the case of *The State of Louisiana* vs. *John McDonogh et al.,* 6 Dec. Dep. Int. 473, asking for a specific interpretation of said decision upon the following question: 'Did the aforesaid decision fix absolutely the starting point for the determination of the back line of the McDonogh and Fontenot claims at the most southern point of Lake Maurepas, as it existed at the date of the decision?'

"In the case above referred to, the department held that the depth of this grant could be ascertained by finding a depth equal to or corresponding with the depth of Lake Maurepas from the river; that is, by drawing a line 'through the center of the grant from front to rear, terminating at the point of intersection of a line drawn at right angles thereto, so as to touch the lowest point of the southern shore of the lake.'

"I find nothing in this decision to indicate that it was the intention of the secretary to authorize an investigation as to whether the shore of the lake had been changed since 1769, but, on the contrary, it seems to be clearly indicated that the southern shore of the lake, as it now exists, should be fixed absolutely as the starting point to determine the back line of said grant. You will instruct the surveyor general accordingly."

The then acting commissioner of the land office, on the 21st May, 1891, sent his instructions to the surveyor general, in which he says:

"It is sufficient to state that the inclosed decision directs that the southern shores of the lake, as it now exists, shall be fixed absolutely as the starting point to determine the back line of the aforesaid claims. * * * You will, therefore, at your earliest convenience, prepare a contract and bond, with special instructions, for the execution of the work and forward the same to this office for examination and approval."

Thereupon the surveyor general made a second contract with appellee as deputy surveyor, taking bond, as before, for the survey and location of the back line of this grant, giving special instructions, in accordance with the secretary's last ruling for the work, which contract, bond, and special instructions were approved by the commissioner of the land office July 10, 1891. To prevent the obliterating of the former survey, and the making of the new survey, contemplated by this second contract with, and special instructions to, the appellee as deputy surveyor, the bill in this case was exhibited in the circuit court, and a restraining order granted as prayed for by appellant. The bill for injunction coming on for hearing on the 2d February, 1892, the prayer for injunction

was denied, and the restraining order that had been issued dissolved. This action of the circuit court being accepted as a final decree, the appellant prayed for an appeal to this court, which was granted by the circuit court, and, under rule 93, the injunction as contained in the restraining order was continued in force.

The appellant contends "that the law did not require the surveyor general, or the commissioner, to file the approved plat of the survey of the Dupard grant in the local land office, and that therefore their withdrawing it from such filing did not constitute a lawful retention by either of any control or authority over the plat or grant," and that the courts have jurisdiction to review and pass upon the subject-matter, and to protect the private rights of appellant against misconstruction of the law by the officers of the land department; that the first survey made by appellee, under the decision of the secretary of January 6, 1888, and in compliance with the special instructions of the surveyor general, having been approved by the surveyor general, separated appellant's land, held under a completed grant by former governments, from the public domain, and exhausted the power of the executive arm of the government over this grant, and that the subsequent action of the secretary of the interior transcended his authority.

Counsel for appellant cites the case of *U. S.* v. *Stone*, 2 Wall. 525, and presses it in his oral argument as supporting his contention. In that case it appears that the land in question had been surveyed for a military reservation by orders of the secretary of war in 1854, and the survey had been approved by the president. In 1861 the secretary of the interior ordered surveys to be made of the lands in question, which was done, "and, everything having gone through the usual forms, patents passed the great seals, and having been signed by the president," were duly delivered to the patentees. In 1862 the secretary of the interior decided that the patents had been issued without legal authority, and he declared them void and revoked. However, to proceed rightly, the United States filed a bill in the federal court for the district in which the land was situated against the holders of the patents, to have them judicially decreed to be null, and the instruments themselves delivered up for cancellation. The trial court gave the decree asked for, and the holder of the patent appealed to the supreme court. That court held that—

"The secretary of the interior, in 1861, transcended his authority when he attempted to override the acts of his predecessor."

That—

"The patent is but the evidence of a grant, and the officer who issues it acts ministerially and not judicially. But one officer of the land office is not competent to cancel or annul the act of his predecessor. That is a judicial act, and requires the judgment of a court."

This case, and numerous others which the diligence of counsel has presented to us, and which have had due consideration, show that when the action of the land department is complete and finished in any given matter, when the last act in the series essential to the transfer of title

has been performed, the power of the executive department is exhausted, and private rights thereby conferred or evidenced immediately come under the protection of the judicial department, and the courts then have jurisdiction—

"To correct mistakes, or to relieve against frauds and impositions, and in cases where it is clear that those officers [of the land department] have, by mistake of the law, given to one man the land which, on the undisputed facts, belonged to another, to give appropriate relief." *Moore* v. *Robbins*, 96 U. S. 530; *U. S.* v. *Schurz*, 102 U. S. 378; *Johnson* v. *Towsley*, 13 Wall. 72.

All these cases and many others announce or assume that while the officers of the government are in the discharge of their duties, in dealing with the question in what manner a survey of the public domain shall be made, the courts will not interfere by injunction or *mandamus*. We understand appellant's counsel to concede that the calls of this grant as set out in the original instrument are such as to require that there should be an authorized survey to fix the lines and separate the land embraced in this grant from the public domain, and that the land department was the proper authority to direct and approve such a survey; and of this we have no doubt. And while the making of such survey was still in progress it remained subject to the ultimate control of the secretary of the interior. And it would seem to result from the very nature of the case that the secretary must retain authority to construe any former orders of his department so far as to determine whether the commissioner of the land office and the surveyor general and the surveyors in the field have properly executed such former orders until that execution is completed.

In this case the survey was made and return made of it to the surveyor general's office in New Orleans. It was made in accordance with his instructions. He approved it, but, in accordance with the usual mode of procedure, he forwarded the report of the survey, with his approval, and with the protests filed against it, to the commissioner of the land office for his action; and the commissioner, approving only so far as disbursements had been made, reserved the question as to the correct location of the rear line of the grant for further consideration and advice. Thereupon the matter was referred to the secretary, and he was thus called on by the duties and powers of his office to construe the decision of his predecessor, made 6th January, 1888. There is nothing in that decision to indicate that there was present in the secretary's mind any suggestion that the southern shore of the lake had changed its position since the date of the grant. It is therefore entirely silent on the question which has so exercised the surveyor general and the parties in interest as to whether the most southern point of Lake Maurepas, as it existed at the date of the grant, or as it existed at the date of the decision, or as it should exist at the time of the survey, was to limit the depth of this grant. No such question is referred to in that decision. But, assuming that the secretary must have meant the most southern point as it existed at the date of the grant, and that there is evidence that the position of the southern shore line of the lake has materially changed, and

that its position in 1769 might still be ascertained or reasonably approximated, still the determination of this point, as it would greatly affect the area of the grant, would involve the exercise of such responsible discretion as would require that the matter should proceed subject to the ultimate control of the chief officer of the department. If there did not appear to have been any change in the position of the lake, no such question could arise. If a change appeared to have taken place, and no satisfactory evidence could be obtained to fix its different location in 1769, or at any time since that date, there would seem to be no room for question that its present position must control. If, however, the surveyor in the field, on evidence which failed to satisfy his own mind, adopted a conjectural point, and the surveyor general approved the survey made on that basis against the protest of parties interested, the matter must come in the usual course of such proceedings to the commissioner of the land office, and from him to the secretary of the interior, unless the decision, not of the former secretary, for that is silent, but of the contract surveyor in the field, approved by the surveyor general, must in this particular case be held to be final on the subject, which we understand to be the contention of appellant's counsel.

But, with all respect, in our opinion no sound reason or semblance of authority has been offered or has occurred to us why in this case the decision of these subordinate officers should be final. When we take into view the fact that, in one form or another, this matter had been pending for nearly a century before January 6, 1888, it must be conceded that no undue delay has been indulged since that time in directing, considering, and acting on the survey required by the decision and order of the secretary of that date.

Whether the construction of that order, announced by the present secretary of the interior, is in entire harmony with its terms and effect, we do not feel called on by this case to decide. We are of opinion that the matter of fixing the rear line of this survey on the ground was still, and is still, an unfinished proceeding, and the proper subject for the further action of the political department of the government. It follows that the decree of the circuit court refusing the injunction must be affirmed and the restraining order dissolved. *Cragin* v. *Powell*, 128 U. S. 691, 9 Sup. Ct. Rep. 203, and cases and statutes cited in that opinion.

And it is so ordered.